**Cornelius LEWIS, Petitioner-Appellee,**

v.

**C. Murray HENDERSON, Warden, Respondent-Appellant.**

**No. 16985.**

United States Court of Appeals Sixth Circuit.

July 19, 1967.

See also 6 Cir., 356 F.2d 105.

Ed R. Davies, Special Counsel, Nashville, Tenn., for appellant, Henry C. Foutch, Asst. Atty. Gen., State of Tennessee, Nashville, Tenn., on brief, George F. McCanless, Atty. Gen., Nashville, Tenn., of counsel.

James H. Bateman, Nashville, Tenn., for appellee, Fritz Bateman, Nashville, Tenn., on brief.

Before EDWARDS and McCREE, Circuit Judges, and McALLISTER, Senior Circuit Judge.

McALLISTER, Senior Circuit Judge.

This is a sad case, arising out of two trials, during which mistrials were declared. Thereafter, appellee was convicted on a charge of guilty of assault with intent to commit murder in the first degree, and his punishment was fixed at confinement in the State Penitentiary for a period of not more than twenty-one years. It all started when appellee was arrested for attempted murder of two members of the Nashville, Tennessee, Police Department. He was thereafter indicted in the Criminal Court of Davidson County, Tennessee, on two charges of assault with intent to commit murder. Appellee pleaded not guilty to each indictment, and the public defender was appointed to represent him. Both cases were thereafter called for trial, and, upon arraignment, appellee entered a plea of guilty. A jury was impaneled, and evidence was presented by the prosecution.

However, appellee, when questioned by the trial judge, responded that he did not understand the charge, and changed his plea from guilty to not guilty. A mistrial was entered in both cases.

Later, the second of the two cases was again called for trial, and appellee pleaded not guilty. The case was tried, and the jury, after hearing the evidence, found appellee guilty as charged, and fixed his punishment at confinement in the State Penitentiary for not more than twenty-one years. On the same date the first case was continued. Thereafter, the public defender filed a motion for a new trial in the second case, which was overruled. The trial court then passed judgment on appellee.

On November 12, 1963, the first case was again called for trial, and appellee pleaded guilty. Evidence was introduced by the prosecution, but when the court further questioned appellee, he again responded that he did not understand the case, and changed his plea to not guilty. A mistrial was entered for the second time. On February 10, 1964, the first case was "retired" upon motion of the district attorney.

On August 3, 1965, appellee filed his petition for a writ of habeas corpus in the United States District Court, containing a number of allegations of denial of his rights: "(1) compulsory process for the obtaining of witnesses; (2) assistance of counsel; (3) cruel and unusual punishment in that he was shot by the arresting officers; (4) right to counsel at his preliminary hearing; (5) effective assistance of counsel; (6) a copy of the indictment; (7) right to testify in his own behalf; (8) unauthorized entry of a plea of guilty to attempt to commit first degree murder; (9) right to appeal; and (10) being called a 'black boy' by his own counsel in the presence of the jury."

Respondent admitted that appellee had exhausted his state remedies, but denied that the judgment was void or that appellee was unlawfully or unconstitutionally confined. Appellee testified that on the hearing of the petition for a writ of habeas corpus that he pleaded not guilty on the day of his trial, and that he wanted to testify, but did not do so. He could not recall whether he had talked to the public defender about wanting to testify. He stated that he did not tell the public defender that he wanted to plead guilty to a lesser offense, and did not know whether such counsel entered that plea for him. He stated that he was present in court when his motion for a new trial was denied but did not talk to the public defender about appealing the case, and that the latter had not said anything to him about an appeal and did not advise him that he had a right to appeal.

On the hearing of the habeas corpus petition, the controlling evidence is to be found in the candid, explicit, and credible testimony of the obviously just and humane public defender, who testified as follows:

"I interviewed the defendant in jail as soon as my office received the assignment and investigation revealed that he was accused of attempting to murder two policemen who had stopped him about one-thirty in the morning on a side street leading off of Jefferson Street out by Brother Pigg's Meat Market. My investigation revealed—I got details from the defendant that he was out walking and had a pistol with him for no unlawful purpose. He never did explain why he had it too carefully and that he didn't realize that a man who accosted him and asked him what he was doing there was a police officer.

"But he thought he was someone trying to do him some harm. So, in an effort to defend himself, he turned around and started shooting and then the person that he shot and his companion, one or both of them, shot him a number of times, and he was taken to the hospital and later put in jail.

"He wasn't too communicative and after a great deal of negotiations with him it was decided that he would enter a plea of guilty and after recitation of the facts by the state's attorney, the judge asked him if he understood and

agreed with the facts and he, at that time, indicated he did not.

"So the judge said, of course, a mistrial would be granted.

"He came on for trial again and the officers involved testified substantially to the facts that I have outlined and we did not have a court reporter and I must confess to not being exact on my details, but as I recall, it, Mr. Lewis did take the stand he testified that he was under fear, that he thought that he was being accosted by someone who would do him harm and that under those circumstances he was trying to defend himself and shot the officer.

"It was my theory of the case that Mr. Lewis under the facts that he set out, was probably guilty of an attempt to commit manslaughter but not murder because there was, in my opinion, and the record I believe would bear me out if there was a record, so there is not a record, that there was no proof of any premeditation which, of course, is a necessary ingredient for the State offense of first degree murder.

"There was no proof of premeditation. There was no proof that Lewis was committing or attempting to commit a felony that would supply the absence of premeditation.

"So, I advised—in my argument to the jury I in fact admitted that I thought they would be justified in finding him guilty of an attempt to commit voluntary manslaughter, which would've been, in all probability a workhouse sentence.

"He had had a number of months in hospital under confinement and in jail, and if he had received a workhouse sentence in effect, he would've been free because he had already built his sentence.

"The jury did not buy my theory and they convicted him of first degree murder.

"I think the Court interpreted my statements to the jury as a plea of guilty to the attempt to commit the crime of involuntary manslaughter and it was placed in the record that the plea was made through his attorney.

"I do not recall this man personally ever pleading guilty to anything.

"I advised Mr. Lewis that, in my opinion, he had a good chance to have his conviction overturned on appeal. And I filed a motion for a new trial.

"Bear in mind I was very handicapped. I had one assistant in the office and he was assigned to another court. So, in effect, I had no help in the Criminal Court that I was responsible for.

"And I must plead guilty to certain degrees of inadequacy in my representation of all the clients at that time because I frankly did not have the help and the time to do as good a job as I would liked to have done.

"In any event, I discussed this with the Attorney General, I think it was Mr. Hollins, and even the Judge.

"And there was an arrangement, an agreement that if he were—if the State would withdraw the second charge of assault with intent to commit first degree murder that there would be no appeal made.

"I entered into this agreement reluctantly but I realized the overwhelming odds against me overturning a jury verdict approved by the Trial Court even though I personally was convinced that there was no premeditation proved enough to sustain a conviction.

"On the other hand, I was faced with this dilemma, if they put him to trial on the second indictment the facts were exactly the same and there was a very good chance he would be convicted again and given another three to twenty-one year sentence which would've made it almost an impossibility for him to have been released in any period other than many, many years.

"So, I discussed this with Mr. Lewis. I told him in effect that under three to ten year sentence that he had that he would technically be eligible for release in some twenty-seven months less the credit he had already built up

and finally he agreed to—at least I got the impression he agreed, although, frankly, he never did get through too well, but I got across to him that the other case would be dropped. If he would forego his constitutional right to appeal and that was the reason my office did not appeal the case.

"I would have appealed the case if it hadn't been for the agreement that the other charge would be dropped.

"And I reiterate at this time, I do not think that the State proved premeditation that would have constituted this but I had no record. At that time, we had no public reporter law in Tennessee. We have now, thank goodness. And it was a burdensome task to get up narrative bills of exceptions.

"I was having on every instance that I attempted to get narrative bill of exceptions, I was having a great deal of trouble getting the State's Attorney to agree to the authenticity of it and the trial judge would not approve them unless the State agreed and it was—it took a great deal of time and effort to get those narrative bills of exceptions up, so I just, under the circumstances, thought this was the only thing to do."

By Mr. Bateman (counsel for appellee, in examining the public defender):

"Q. I believe you said  *  *  * that you actually didn't recall whether Mr. Lewis pleaded guilty to anything or not himself during this second trial?

"A. I don't recall him ever pleading guilty. I remember on this occasion he had indicated to me he was going to plead guilty but when the time came and Judge Leathers never accepts a plea through attorneys. He always makes the defendant stand up and makes the defendant enter his plea himself to a charge, that is a plea of guilty.

"He will accept a plea of not guilty through attorneys but not a plea of guilty and so he never stood up and said he was guilty to anything as I recall.

"Q. Mr. Lewis claims in his petition that he was denied effective representation. Do you have anything to say about that?

"A. Well, as I have just pointed out, because of the lack of facilities of the office that I was holding at that time perhaps the representation was not as effective as it should've been.

"I didn't have the time nor the staff to really—well, for instance, the lack of a court reporter was the big thing in this case that I think would have handicapped him on appeal."  *  *  *

The public defender was then questioned by the District Court:

"Q. [T]his case was tried, according to the certified copy of the record on the 31st day of October, 1963. Was the date of trial. Now, after you filed your motion for a new trial, and after that motion was overruled, wasn't there a start of the trial on the other case?

"A. No, sir.

"Q. There was not?

"A. Not that I recall.

"Q. Other case was just dropped after the motion for new trial was overruled?

"A. Yes, sir, I checked with the clerk in that court yesterday and we refreshed our memories about that. It was retired.

"Q. Yes, sir, it was retired all right, but the record shows that after the motion for new trial was overruled, that another one, another occasion several days later, this other case came on for hearing, plea of guilty was entered, and then when he was finally asked about it after the proof had gone on he said he didn't understand and declared a mistrial?  *  *  *

"A. Yes, I believe now that you mention that, that did occur. In other words, he tried—he made up his mind that he wasn't guilty on both occasions, I believe that is right as I recall.

"Q. When was this agreement made not to appeal it because they were

going to drop the other case? After mistrial had been declared again?

"A. Here is the way—I believe this happened, if the Court please, there was an agreement made that if he would plead guilty to the second offense he would be given a concurrent sentence which would amount to the same thing as far as the time in confinement would be concerned.

"Then, he again balked on entering a plea of guilty even though it had been explained to him that he would be—it would not amount to any more time in the penitentiary. That is true. These cases kind of run together.

"And then, it was the next term of court when it would have come on normally again but meanwhile an agreement had been made that the case would just be retired rather than concurrent sentence given on plea of guilty.

"Q. So, there wasn't any agreement not to appeal it because it was going to be retired?

"A. Yes, sir, there was.

"Q. I thought you said the agreement not to appeal it was based on the getting of concurrent sentence?

"A. There were two agreements but Mr. Lewis failed to keep his and anticipated part of the first agreement, that is, that he would plead guilty to in return for getting a concurrent sentence.

"He didn't understand it apparently even though I thought it had been carefully explained at the time and I thought he agreed to it. He didn't.

"It was after that that instead of concurrent sentence approach to it, the State and my office took a retirement approach to it and with the understanding that there would be no appeal of the first case."

On cross-examination by government counsel, the public defender testified:

"[A]t the time the office was without the facilities that I felt were minimally adequate to effectively represent a client on an appeal of the matter.

"For instance, I, with the limited budget I had, I had hired a man as secretary rather than having a competent typist in that position because I needed someone to investigate and help with the actual courtroom work.

"I had no court reporter facilities and when I said that I felt the office was inadequate, I in all modesty didn't mean to cast any reflections on my adequacy as counsel in the courtroom.

"It was the paperwork that was piling up at that time that made it very difficult to perfect an appeal.

"I didn't mean to give the impression that I didn't think this man had adequate representation in court. I do believe he was adequately represented in court, as I say, modesty aside. But I was of the opinion that the State failed to prove premeditation. I was of the opinion that we had a good appeal.

"Q. Yes, sir.

"A. But in view of the fact that we could settle the case for—that is, the pending case, the one that was yet to be tried, in such a manner that it wouldn't give him any more exposure to more time;

"I discussed it with him in great detail and it was my understanding that rather than take the risk of, one, winning the appeal and the subsequent trial of that case.

"And winning the pending case, it would be better to go ahead and withdraw the appeal and accept a concurrent sentence on the pending case. * * *

"Q. And it was then determined at a later time to not appeal this pending —rather, not appeal the conviction in return for an agreement to retire the pending case. Is that correct?

"A. Well, the first agreement was that he would be given the same consideration he had been offered before either case was tried.

"That is on his plea of guilty to the offense, the State would recommend a concurrent sentence. He, when brought into court and asked by the judge if he understood, he indicated he did not for the second time a mistrial was entered, so General Hollins and I just agreed, well, the same effect would be had if this case was retired.

"And on the State's agreement to retire the pending case, I, in turn, agreed not to appeal the conviction.

"Q. And was your agreement done with the knowledge and consent of your client?

"A. It was my understanding it was. I certainly explained it to him. Now, whether he understood it or not, I don't know."

We have quoted extensively from the testimony because of the important issue involved in this case, and because the evidence above referred to presents all of the facts in the detail which we consider necessary to an understanding of the issue which was so clearly analyzed by the District Court in its order granting appellee's petition for a writ of habeas corpus and in declaring the judgment of conviction void. In his decision in the District Court, Judge Frank Gray, Jr. summed up the problems and reduced them to a single controlling factor.

Referring to the testimony and the record, Judge Gray, in his determination of the petition for the writ of habeas corpus, stated:

"After this abortive attempt to conclude the second case, a new agreement was apparently reached between Mr. Galbreath and the prosecuting attorney's office that the second case would be retired if no appeal was had in the first case. Mr. Galbreath indicated in his testimony that he was very reluctant to enter into any agreement precluding the appeal because he felt that he had a good chance to overturn the conviction, but that he was strongly motivated by the work situation in the Public Defender's office. He stated, however, that he did feel that the final retirement of the second case in exchange for no appeal of the first case was probably a good agreement as the risk of another conviction in the second case was present. *The court agrees with this reasoning on the part of the Public Defender, but the record does not show that the petitioner ever knew and understood the agreement made and indicates, even more strongly, that, if he had understood the proposed agreement, he would have dissented from it.* (Emphasis supplied.)

"The court realizes the difficulties which appointed counsel and public defenders have in dealing with extremely ignorant persons whom they are sometimes called upon to defend. At the hearings on this matter the court received the very strong impression that the petitioner herein is a person with a low degree of intelligence. In spite of this regrettable situation, the statements made by [the Public Defender] that, due to no fault of his own but due to the overwhelming amount of work in his office and his limited staff, he had furnished inadequate representation to this petitioner impel the court to the conclusion that he was denied, by State action, his right to appellate review of his conviction. * * *

"It is Ordered that the petitioner be released by respondent within ten days from the entry of this order, the judgment under which he is being held hereby declared void."

We are in accord with the determination of the District Court, and the judgment is affirmed for the reasons set forth by Judge Gray.

Judge Gray, in decreeing that the judgment under which appellee was being held was void, entered an order that appellee be released by the Warden within ten days of the entry thereof. This was a stay order, and under Rule 49, Section 4, of the Rules of the Supreme Court, such initial stay order covered not only the review in this court, but also possible review in the Supreme Court.

We consider this case, with regard to the question of violation of constitutional

rights, similar to that in Lane v. Brown, 372 U.S. 477, 83 S.Ct. 768, 9 L.Ed.2d 892, where the public defender in a state court, in the exercise of his discretion, refused to file an appeal in a criminal case because he thought it would be unsuccessful. It was held that this action, on the part of the public defender, raised for the court the question of deprivation of defendant's constitutional rights under the Fourteenth Amendment.

It is, therefore, ordered that appellee be released by the State, unless further proceedings be initiated by the State within ten days of the date of entry of this opinion and order.

McCREE, Circuit Judge (concurring).

I concur in the result because I agree with the finding of the district court that petitioner was denied the effective assistance of counsel, a right guaranteed him under the Fourteenth Amendment. Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); Anders v. State of California, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (May 9, 1967).